**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>INWOOD HEIGHTS HOUSING<br>DEVELOPMENT FUND CORPORATION,<br><br>Debtor. | **NOT FOR PUBLICATION**<br><br>Chapter 11<br><br>Case No. 11-13322 (MG) |

**MEMORANDUM OPINION (I) LIFTING THE AUTOMATIC STAY FOR CAUSE**
**PURSUANT TO 11 U.S.C. § 362(d)(1) AND (II) GRANTING OTHER RELIEF**

*A P P E A R A N C E S:*

CORPORATION COUNSEL OF THE CITY OF NEW YORK
*Attorneys for the City of New York and Its Agencies*
100 Church Street, Room 5-223
New York, New York 10007
By:     Gabriela P. Cacuci, Esq.

PETER F. ANDERSON, JR., ESQ.
*Attorney for the Debtor*
370 East 149th Street, Suite C
Bronx, New York 10455
By:     Peter F. Anderson, Jr., Esq.

TRACY HOPE DAVIS
*United States Trustee for Region 2*
22 Whitehall Street, 21st Floor
New York, New York 10004
By:     Serene K. Nakano, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

New York City and its agencies, including the New York City Department of Housing

Preservation and Development ("HPD"), the New York City Department of Finance ("DOF"),

and the New York City Water Board (the "Water Board") (collectively, herein, "NYC" or the

"City") move pursuant to General Order M-389 to withdraw this case from mediation and move

pursuant to 11 U.S.C. § 1112(b) to dismiss this chapter 11 case for cause, including lack of good

1

faith, or in the alternative, to lift the automatic stay pursuant to 11 U.S.C. §§ 362(d)(1) and/or

(d)(2) (the "Motion").  (ECF Doc. # 9.)  Inwood Heights Housing Development Fund

Corporation (the "Debtor") interposed an objection on August 8, 2011 (the "Objection").  (ECF

Doc. # 13.)   A hearing on the Motion was held on August 22, 2011 (the "Hearing") and the

Court took the matter under submission.

The Debtor has for many years demonstrated a shocking disregard for nearly every

obligation imposed by law on this not-for-profit low income housing development corporation.

It filed for bankruptcy on the eve of a foreclosure sale that would only result in a sale to a new

entity legally committed to maintaining this housing for low income tenants.  None of the tenants

currently occupying apartments in the Property (defined below)—at least if they are paying their

very low rents—will be displaced or evicted from their apartments.  Indeed, the tenants will be

far better off if the Property is owned and managed by responsible parties.

For the reasons explained below, the Court grants the City's request to vacate the

automatic stay and withdraw the case from mediation.  Additionally, the motion to dismiss the

case is granted, but entry of an order dismissing the case will be held in abeyance until NYC is

able to complete a foreclosure sale of the Property.

## BACKGROUND

### A.  Incorporation of the Debtor

The Debtor was incorporated in 1992 pursuant to article XI of the Private Housing

Finance Law and section 402 of the Not-for-Profit Corporation Law (the "N-PCL") of the State

of New York as a Housing Development Fund Corporation ("HDFC").  The Debtor was created

specifically for the purpose of operating low income and homeless housing under the City's

Special Initiatives Program ("SIP").  The SIP was created by the City in an effort to reduce urban

blight by providing shelter to low income and homeless City residents.  In accordance with the

SIP, and to ensure that 1484 Inwood Avenue, Bronx , New York (the "Property" or "Premises")

conveyed by the City would be operated to effectuate the City's desired public policy objectives,

the Debtor was required to execute, in addition to a note (the "Note") and mortgage (the

"Mortgage"), certain Project Loan Documents ("PLDs"), such as (a) a Land Disposition

Agreement (the "LDA"), (b) a regulatory agreement (the "Regulatory Agreement"), and (c) a

Special Initiatives Program Funding and Disbursement Agreement ("FDA") for Project

Reserves, all dated as of December 19, 1995 and recorded with the Note, Mortgage and the deed

(the "Deed") in the City's Register Office.  The Mortgage and the PLDs contain cross-references

and cross-default provisions and involve both monetary and non-monetary events of default.

(Motion Exs. 1–6.)

     As described in the City's Motion, the "special status and unique purpose of the Debtor is

reflected in all the legal documents executed by the Debtor in connection with the City's

conveyance of the Premises to the Debtor."  (Motion ¶ 16.)  The Debtor's Certificate of

Incorporation (the "Certificate") provides that the Debtor was founded as a single purpose entity

organized "exclusively for the purpose of developing a housing project for persons of low

income."  (ECF Doc. # 10 Ex. 1, Art. II.)  The Debtor's Certificate also dictates that during the

lifetime of the Regulatory Agreement with HPD, "the property or franchise of the Corporation

may be disposed of only with the consent of HPD."  (*Id.* Art. V.)

1. **The Land Disposition Agreement and Subsequent Additions to the Debtor's Board of Directors**

The LDA, entered into on December 19, 1995, provided for the sale of the Property to the Debtor for the nominal sum of $1. The LDA further provided that in exchange for the Property, the Debtor gave HPD a non-interest bearing "Enforcement Note" secured by an "Enforcement Lien Mortgage" in the amount of $999,999.00, the equivalent appraised value of each multiple dwelling within the disposition site, as rehabilitated by the City and delivered to the Debtor in turnkey condition. In addition to the financial terms of the conveyance, the LDA set forth Bronx Heights Neighborhood Community Corporation's (the "Sponsor" or "Bronx Heights") and the Debtor's agreement to enter into and comply with the terms of the Regulatory Agreement and FDA, both of which were annexed to and executed and recorded simultaneously with the LDA.

Paragraph 404B of the LDA provides that "any subsequent additions to the HDFC's Board of Directors consisting of individuals who are not corporate officers of or directors of the Sponsor which occur prior to the expiration of the Restriction Period[1] shall be subject to HPD approval, which approval shall not be unreasonably withheld." (Motion ¶ 22.) The City contends that the current incarnation of the Debtor's board of directors, or at least those on the board who decided to file the bankruptcy petition, were never authorized by HPD and therefore did not have the authority to file for bankruptcy. The Debtor, in its Objection, states that "The Board of Directors authorized the filing of the chapter 11 Bankruptcy Petition . . . . With respect to the appointment of a new board or new management the board was not aware that it had to get prior notice and consent as the Debtor has had many dealings with HPD . . . and no one apprised it that they need approval of new offices [sic] or directors, even though HPD had been in contact

---

[1] The Regulatory Agreement defines the term "Restriction Period" as the 32nd anniversary date of the 1995 date of the agreement, *i.e.*, until 2027.

with Sergio Clark [the person who the Board of Directors authorized to file the bankruptcy

petition]." (Objection ¶ 4.) At the Hearing, counsel for the Debtor conceded that the current

purported board of directors never received approval from HPD, but indicated that HPD was

aware of the change in board composition because of conversations between HPD and members

of the current purported board.

### 2.  The Deed and Mortgage

The Deed provides, *inter alia*, that the Debtor, as Grantee, "accepts this Deed subject to

all of the terms, covenants and conditions of the Land Disposition Agreement," that the Debtor

agrees to comply with the LDA and the Regulatory Agreement, that the Regulatory Agreement is

incorporated by reference in the Deed, and that the grantee's covenants "shall be covenants

running with the land." (Motion Ex. 3.) Similarly to the Certificate, the Deed contains an

express prohibition against transfer or disposition of the Premises during the Restriction Period

"without prior written approval of the Commissioner of HPD." (*Id.* ¶ 6.) The Deed also

provides for the reverter of the Property to HPD "in the event that the [Debtor] shall fail to

perform or to abide by any of the covenants set forth herein." (*Id.* ¶ 7.)

As mentioned above, at the time the Property was conveyed to the Debtor for the nominal

price of $1, the Mortgage in the amount of $999,999.00 attached, as collateral security for the

payment of the Note in the sum of $999.999.00 made by the Debtor to the City on December 19,

1995. Provided the Note was not otherwise in default, no monthly payments of principal or

interest were required to be made. However, the Mortgage required the Debtor to pay water,

sewer charges and real estate taxes that were not otherwise abated. Upon the thirty-second

anniversary date of the execution of the Note and Mortgage (2027), provided the Mortgage was

not then in default beyond any cure period, the Mortgage would be deemed forgiven.

5

### 3.   The Regulatory Agreement

The Regulatory Agreement also provides that the HDFC and the Sponsor agree that the registration of rents and procedures set forth with respect to rent registration under the Rent Stabilization Code with the New York State Division of Housing and Community Renewal ("DHCR") will be followed.  Specifically, they agreed to comply with maximum collectible rents, the eligibility of tenants and income determinations, the household size and dwelling units/occupancy requirements, re-renting policy, prohibition against use of the property as a condominium or cooperative conversion, marketing plans, management services, tenant development, provision of social services, the establishment and maintenance of "a replacement reserve account" and of an "operating reserve account," and the requirement that they file "annual reports" including an annual budget management plan and social services plan.  (Motion ¶ 29.)

The Regulatory Agreement clearly sets forth a use restriction with regard to the Property, stating that:

> Subject to the provisions of this agreement . . ., all apartments in the Disposition Area must remain as low and moderate income rental housing resources for the Restriction Period, during which time the Disposition Area must be owned by either a not-for-profit corporation which qualifies as such pursuant to 501(c)(3) of the Internal Revenue Code or a governmental entity.

(*Id.* ¶ 30.)  The requirement that the HDFC maintain replacement and operating reserves is important, because these coffers are what the HDFC is supposed to use to fund maintenance and repairs of the Property.  The Debtor's failure to maintain these funds resulted in additional liens on the Property, arising from the City's provision of hundreds of thousands of dollars to pay

heating, water and sewer bills so that tenants would not be without these most basic services.

(Motion ¶ 40.)

### 4. Debtor's Current Financial Position

For over six (6) years, the Debtor has failed to make the requisite financial disclosures to

HPD.  The Debtor failed to file annual rent registration reports with the DHCR until HPD

commenced its foreclosure action in 2008.  It was only then that the Debtor filed its DHCR

registration for the year *2005*.  According to the DHCR, the monthly rent for the Property, which

consists of 27 apartments, was $18,025.00.[2]  (Motion Ex. J.)  However, in the Debtor's Rule

1007-2 Affidavit (the "1007 Affidavit"), the Debtor estimated "cash receipts of approximately

$8,000 for the next 30 days."  (ECF Doc. # 1.)  At the Hearing, Debtor's counsel indicated that

many of the tenants had not paid rent in quite some time, and conceded that the current purported

board of directors had not initiated any Nonpayment Summary Proceedings against these tenants

in New York City Housing Court.

The City contends that the Debtor's schedules do not accurately reflect the Debtor's

liabilities, at least with regard to what is owed the City.  The City's statutory liens alone,

pursuant to section 11-301 of the New York City Administrative Code (the "Admin. Code"), for

unpaid real estate taxes were $309,445.36 as of July 1, 2011 and for unpaid water and sewer bills

were $198,246.65 as of July 12, 2011.  These statutory liens, which prime the Mortgage,

continue to accrue interest at the statutory rate until fully paid.  In addition, the Debtor owes

HPD $999,999.000 under a judgment of foreclosure issued by the state supreme court, plus post-

judgment interest and other costs recoverable in a foreclosure action.  Thus, the City alone has

---

[2]        At the Hearing, neither party knew whether all 27 units were currently occupied, but both parties
acknowledged that a significant number of tenants were not current with their rental payments.

liens in excess of $1.5 million, exceeding the value of the Property as professed in the Debtor's

own 1007 Affidavit.  The Petition and matrix also list $254,255 of unsecured debt due and owing

to the New York State Workers' Compensation Board, Colony Fuel Oil, and Express Plumbing

Sewer & Water Corp (the "Unsecured Creditors").

### B.  Bankruptcy Filing

The Debtor filed a petition (the "Petition") for chapter 11 relief on July 11, 2011 (the

"Petition Date").  The Petition Date coincided with the day when the Debtor's sole asset, the

Property, was scheduled for foreclosure sale.  HPD was attempting to foreclose on the Property

pursuant to a mortgage foreclosure judgment, in the amount of $999,999.00 plus interest and

costs, awarded in *The City of New York vs. Inwood Heights Housing Development Fund

Corporation*, *et al.*, Index No. 251223/09, Supreme Court, Bronx County (the "Foreclosure

Action").  (Motion Exs. A, B.)  The Debtor is a "small business debtor" as defined in 11 U.S.C. §

101(51D) as well as a single asset real estate debtor within the meaning of 11 U.S.C. § 362(d)(3).

The Property was previously included, incorrectly, in the chapter 11 case of Bronx

Heights Neighborhood Community Corporation, Case No. 11-13104 (MG) ("Bronx Heights

Case").  There were several deficiencies with Bronx Heights' petition, so the City brought an

Order to Show Cause seeking dismissal of the Bronx Heights Case.  The City's motion was

granted and the Bronx Heights Case was dismissed by Order Dismissing Case dated July 7, 2011

signed by Judge Chapman.  (Motion Ex. E.)  Bronx Heights and this Debtor are represented by

the same counsel, Peter Anderson, Esq.  As mentioned above, Bronx Heights acted as the

"sponsor" in connection with the creation of various HDFCs, including Inwood Heights, which

is presumably why Mr. Anderson mistakenly indicated Bronx Heights as the Debtor in his first filing attempt.

### C. Debtor's Financial Difficulties and Alleged Commingling/Financial Mismanagement of Rental Receipts by Debtor's Prior Board of Directors

The Debtor's 1007 Affidavit indicates that "the companies' [sic] financial problems are due to mismanagement and possibly misappropriation of funds by the previous executive of the organization."  (1007 Aff. ¶ 3.)  At an evidentiary hearing held on October 20, 2008, as part of HPD's consolidated foreclosure proceedings (including the Foreclosure Action against this Debtor), before Justice Paul Victor, Ms. Gloria Devine Bhutta, as Treasurer of the Sponsor (Bronx Heights) and President of the Debtor and other HDFCs being foreclosed, testified to the commingling of funds between Bronx Heights and the corporate record-owners of the properties being foreclosed (including Inwood Heights), unauthorized loans and write-downs of loans to affiliated entities, the mismanagement of the properties and falsifying of business records. (Motion ¶ 43.)  The Debtor contends that current management is running the Debtor responsibly and that funds are not presently being mismanaged.  However, at the Hearing, counsel for the Debtor indicated that the Debtor has not made any post-petition payments, and has not commenced legal action against those tenants not paying their rent.  While Debtor's counsel was not entirely sure, he stated at the Hearing that the Debtor's purported board of directors had obtained an insurance proposal, but that he did not believe the Debtor was currently insured. Such realities suggest that the Debtor's current purported board of directors is not responsibly managing the Debtor's financial affairs.

### D. City's General Arguments and the Debtor's Objection

The City argues that for the reasons set forth in its Motion, "the chapter 11 filing was not authorized by the Debtor's board of directors approved by HPD, the debtor has no authority to transfer ownership of the Premises, modify the covenants or use restrictions encumbering the Premises, which run with the land, or to appoint a new board or management for the Debtor without HPD's prior written consent." (ECF Doc. # 11 at 2.) The City contends that dismissal, or the lifting of the automatic stay, is warranted because the Debtor filed its petition in bad faith. The Debtor's response was not particularly informative, and did not address the vast majority of the City's arguments. The Debtor's Objection arguably conceded that the Debtor's purported board of directors did not have authority to file by acknowledging that the board was unaware of its duty to obtain HPD's consent to change its membership body. The Debtor did not offer any legal authority in support of its Objection, simply concluding that the Debtor believes "it is in a position to reorganize and make the property a viable property with a reorganization under chapter 11." (Objection ¶ 9.)

### DISCUSSION

NYC contends (i) that cause exists for either dismissing the Debtor's case under section 1112(b) or lifting the automatic stay under section 362(d)(1) because the Petition was filed in bad faith and (ii) the automatic stay should be lifted under section 362(d)(2) because the Debtor lacks equity in the Property.[3] Stay relief would enable NYC to utilize its state law remedies and proceed with a foreclosure sale of the Property. For the following reasons, the Court grants the

---

[3]     Under section 362(d)(2), the court can grant stay relief if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). The Court declines to grant stay relief under section 362(d)(2) because the Property is the Debtor's primary asset, and therefore, would be necessary to any reorganization.

motion to lift the automatic stay for cause and will enter an order dismissing the case after the

Property is sold at a foreclosure sale.[4]

## A.  11 U.S.C. §§ 362(d)(1) and 1112(b) Generally

Under section 362(d)(1) of the Bankruptcy Code, on request of a party in interest and

after notice and a hearing, the court shall grant relief from the automatic stay "such as by

terminating, annulling, modifying, or conditioning" the stay "for cause, including the lack of

adequate protection of an interest in property."  11 U.S.C. § 362(d)(1).  While section 362(d)(1)

explicitly identifies a lack of adequate protection as cause for stay relief, "there are other bases

for a cause finding."  3 COLLIER ON BANKRUPTCY ¶ 362.07[3] (16th ed. rev. 2011).

Section 1112(b) of the Bankruptcy Code governs conversion or dismissal of a debtor's

chapter 11 case.  *See* 11 U.S.C. § 1112(b).  Under section 1112(b), a court can dismiss a chapter

11 case or convert it to a case under chapter 7 "for cause" so long as it is in the best interests of

both the creditors and the estate.  7 COLLIER ON BANKRUPTCY ¶ 1112.04.  Subsection (b)(4)

contains sixteen examples of events that may constitute cause.  This list, however, is "not

exhaustive" and courts are free to consider other factors.  *See, e.g.*, *In re Ameribuild Const.*

*Mgmt., Inc.*, 399 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009) (citing legislative history).

## B.  Stay Relief and Subsequent Dismissal Are Warranted Because the Debtor Reasonably Cannot Rehabilitate in Bankruptcy

Although section 1112(b)(4)(A) explicitly states that cause exists for conversion or

dismissal when there is a "substantial or continuing loss to or diminution of the estate and the

absence of a reasonable likelihood of rehabilitation," 11 U.S.C. § 1112(b)(4)(A), the Court finds

---

[4]    Although NYC moved for dismissal (and stay relief in the alternative), the Court elects to lift the stay now and enter a dismissal order later to guard against the possibility that the Debtor may subsequently file a new bankruptcy case before a rescheduled foreclosure sale.

that, under the circumstances of this case, this same standard evidences cause in the context of stay relief under section 362(d)(1).[5]

In this case, the Court finds that there is a continuing diminution of the estate.  At the Hearing, Debtor's counsel conceded that not all tenants are paying rent and that rent revenues are *not* expected to increase from $8,000 per month.  Other than sending non-payment notices to delinquent tenants, the Debtor has not taken further action since the Petition Date to collect these arrearages.  This pattern of behavior has persisted for several years prior to the Petition Date.[6] It is also equally clear that the Debtor lacks the funds to cover basic repairs or other daily operations.  Specifically, HPD has already advanced funds in excess of $300,000 to maintain the Property.  (Motion ¶ 17.)

In addition, any attempt by the Debtor to rehabilitate will be futile.  Even if the Debtor received proper authority to file the Petition, any legitimate bankruptcy goal would be frustrated by the enforceable restrictions imposed on the Debtor by the Certificate, the LDA, the Regulatory Agreement and the Deed.  Under the terms of these documents, a sale of the Property cannot occur because any such disposition would need to be approved by HPD.  (Certificate Art. VIII) ("For thirty two (32) years from the date of the conveyance of title [December 19, 1995] to the building to the Corporation by the City of New York, the Corporation shall not sell, transfer,

---

[5]      In *In re Hinchliffe*, 164 B.R. 45, 49 (Bankr. E.D. Pa. 1994), the court noted that stay relief was justified under section 362(d)(1) because, *inter alia*, the debtor's "prospects for a successful reorganization [were] slim" due to a lack of sufficient income to fund a plan.  It is also well-established that the bad faith filing of a bankruptcy petition warrants cause for either dismissal or conversion, or stay relief.  *See In re Laguna Assocs., L.P.*, 30 F.3d 734, 737 (6th Cir. 1994) (finding that there is no substantive difference between the cause requirement for dismissal under section 1112(b) and the cause requirement for stay relief under section 362(d)(1)).  In this case, lifting the stay and dismissing the case functionally achieve the same result—the City can sell the Property at a foreclosure sale. Therefore, it is appropriate for the Court to apply the requirements of section 1112(b)(4)(A) to the context of stay relief under section 362(d)(1).

[6]      The rent roll for the Property in 2005 was $18,025.00 per month.  (Motion Ex. J.)  However, based on the 1007 Affidavit, cash receipts are anticipated at only $8,000 for thirty days beginning July 9, 2011.  (1007 Aff. ¶ 13.) It is abundantly clear that there has been a perpetual decrease in monthly rent collections for the past several years. Some tenants have rent arrears exceeding $20,000.  (Motion Ex. K.)

exchange, mortgage or otherwise dispose of or lease all or substantially all of the building

without the prior written approval of the Commissioner of HPD."); (LDA § 402) ("Sponsor and

the HDFC represent that it shall not assign this Agreement nor sell, assign, transfer, mortgage,

lease . . ., transfer in any other mode or form, such [Property] . . . for the term of the Restriction

Period . . . without the prior written approval of the Commissioner of HPD."); (Deed at 2, 3)

("The Grantee agrees . . . to comply with the terms, covenants, and conditions of the LDA and

Regulatory Agreement . . . .  The Grantee covenants and agrees not to sell, transfer mortgage,

exchange or otherwise dispose of or lease all or substantially all of the [Property] for the term of

the Restriction Period without prior written approval of the Commissioner of [HPD].")  In

addition, any purported use of the Property must remain solely for the purpose of providing "low

and moderate income rental housing" until the Restriction Period expires.  (Regulatory

Agreement ¶ 13.)  This restriction, among others contained in the Regulatory Agreement, "run

with the land and bind Sponsor, the HDFC, the HDFC's successors, assigns, heirs, grantees, and

lessees" during the Restriction Period.  (*Id.* ¶ 19.)

The Debtor cannot relieve itself of these restrictions simply by selling the Property under

section 363(f).  Section 363(f) enables a trustee or debtor in possession to sell property of the

estate free and clear of all liens and interests if, among other things, "[a]pplicable nonbankruptcy

law permits sale of such property free and clear of such interests."  11 U.S.C. § 363(f)(1).  In *In

re 523 East Fifth Street Hous. Dev. Fund Corp.*, 79 B.R. 568 (Bankr. S.D.N.Y. 1987), the debtor,

which was a HDFC, sought an order pursuant to section 363(f)(1), permitting a sale of real estate

free and clear of all liens and encumbrances, including a covenant from NYC (located in the

deed) restricting the use of the property to low income housing.  *Id.* at 569, 571.  The court

analyzed applicable provisions of the New York Real Property Actions and Proceedings Law

13

(the "RPAPL") and found that "[b]ecause the covenant contained in the deed was created for a public purpose with a governmental unit, subdivision and agency of New York State, it is not voidable under [RPAPL] § 1955." *Id.* at 571; *see also* N.Y. REAL PROP. ACTS. LAW §§ 1951, 1955 (McKinney 2011).  The court also concluded that the deed restrictions are restrictive covenants which run with the land. *523 East Fifth Street*, 79 B.R. at 574–75.[7]  It follows that this case, which is factually similar to *523 East Fifth St.*, would lead to the same conclusion— namely, that the Debtor cannot use the Bankruptcy Code to obviate compliance with any sale restrictions contained in the Deed.

Nor is it likely that the Debtor can confirm a standalone plan.  Assuming *arguendo* that the Debtor's $1.3 million value of the Property is accurate (1007 Aff. ¶ 5), NYC's security interest in the Property exceeds the Property's value.  While the Debtor maintains that the "amount of claims on the property is approximately $1.1 million" (*Id.*), NYC received a foreclosure judgment in the amount of $999,999.00 (1007 Aff. ¶ 6; Motion ¶ 35) and has statutory liens in the amount of $309,445.36 for unpaid real estate taxes as of July 1, 2011 and $198,246.65 for unpaid water and sewer charges as of July 12, 2011.  (Motion ¶ 46, Exs. N, O.) In the aggregate, NYC has a secured claim that exceeds the Debtor's own valuation of the Property.[8]

---

[7]    In *523 East Fifth St.*, the debtor also argued that equitable principles warranted relief under section 363(f)(5) (permitting a sale free and clear if "such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest"). *Id.* at 575.  The court found that equitable grounds did not exist because, among other things, "[t]he City has not abandoned its objective in seeing the low income housing shortage problem alleviated via the Debtor's property.  No acquiescence in violation has been established." *Id.* at 576.

[8]    Admin. Code § 11-301 provides that "taxes and all assessments and all sewer rents, sewer surcharges and water rents, and the interest and charges thereon, which may be laid or may have heretofore been laid, upon any real estate now in the city, shall continue to be, until  paid,  a  lien  thereon, and shall be preferred in payment to all other charges."

Furthermore, the Debtor has not shown that it can obtain financing from a third party to pay NYC's secured claim (among other claims) or explained how it can obtain the appropriate means to implement a plan.[9]   At the Hearing, Debtor's counsel indicated that several community groups were interested in assisting the Debtor to pay back the City.  However, Debtor's counsel did not indicate which community groups he was referencing, and did not represent that they had signed anything indicating an actual intent to assist the Debtor financially.  Even if the Debtor did obtain financing from a community group or a private entity, the loan would be likely subject to approval from HPD.  (LDA § 402.)  It is likewise clear that Debtor's rental income—even if all tenants were paying their rent stabilized rent—could not support debt service on the size of a loan required to fund a plan.  Here, HPD has expressed that it is committed to going forward with the "foreclosure sale and credit bid or transfer the Property to another HDFC."  (Motion ¶ 48.)

## C.  NYC Is Not Adequately Protected

Stay relief is available to a party with an interest in estate property when the party's interest is not adequately protected.  *See* 3 COLLIER ON BANKRUPTCY ¶ 362.07[3][b].  The term "adequate protection" is not defined in the Bankruptcy Code, but section 361 "gives examples of what might constitute adequate protection and, at least in one instance, of what will not constitute adequate protection."  *Id.*  Specifically, adequate protection may be provided by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

---

[9]   The Petition indicates that the Debtor's total unsecured debt stands at approximately $254,255.00.  (Petition at 4–5.)

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

One common way of meeting the "indubitable equivalent" standard in section 361(3) is through the existence of an equity cushion. An equity cushion in property "provides adequate protection if it is sufficiently large to ensure that the secured creditor will be able to recover its entire debt from the security at the completion of the case." *In re Elmira Litho, Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994). "An equity cushion exists if the value of the collateral available to the creditor exceeds by a comfortable margin the amount of the creditor's claim." 3 COLLIER ON BANKRUPTCY ¶ 362.07[3][d][i]. The amount of equity cushion sufficient to provide adequate protection is determined on a case-by-case basis. *See, e.g.*, *In re James River Assoc.*, 148 B.R. 790, 796 (E.D. Va. 1992).

In this case, NYC is not adequately protected. To the contrary, at the Hearing, it became clear that the Debtor has not met any of its basic post-petition obligations—let alone attempt to provide adequate protection to NYC on account of its secured claim. Moreover, based on the value of the Property contained in the Debtor's 1007 Affidavit, the amount of NYC's liens significantly exceed the Property's value—thereby eliminating any potential for the existence of an equity cushion.

16

### D.  Lack of Authority to File the Petition and Bad Faith

NYC argues that contrary to the terms of the Certificate and LDA, HPD did not authorize Sergio Clark ("Clark"), the signatory on the Debtor's petition, or the purported management to act on behalf of the Debtor.  Accordingly, NYC believes that Clark lacked the requisite authority to file the Petition.  NYC's legal argument is further premised on the intersection of Clark's and the current purported board's alleged lack of authority and bad faith.  Specifically, NYC contends that the Petition was impermissibly filed in an attempt to forestall eventual foreclosure and transfer of the Property.

### 1.  Lack of Authority

Caselaw has long held that for a corporation, "the initiation of the [bankruptcy] proceedings, like the run of the corporate activities, is left to the corporation itself, i.e., to those who have the power of management." *Price v. Gurney*, 324 U.S. 100, 104 (1945).  The source of such authority is derived from state law, the corporation's certificate of incorporation and the by-laws.  2 COLLIER ON BANKRUPTCY ¶ 301.04[2][b].  Typically, the authority to file rests with a corporation's board of directors.  *Id.*  Under N-PCL § 701(a), "[e]xcept as otherwise provided in the certificate of incorporation, a corporation shall be managed by its board of directors."  Under New York law, "[i]n the absence of any restriction, by statute or by the charter and by-laws, the power of the board to make a general assignment of the property of a corporation which is unable to meet its current obligations for the benefit of creditors or to apply for a receivership is to be presumed.  The voluntary petition for adjudication as a bankruptcy is tantamount to such proceedings." *In re Guanacevi Tunnel Co.*, 201 F. 315, 318 (2d Cir. 1912) (internal citations omitted).

17

Moreover, a bankruptcy petition requires corporate action by the board of directors unless the board confers such authority on another individual. *In re Jefferson Casket Co.*, 182 F. 689, 691 (N.D.N.Y. 1910). Indeed, "[t]he important step of going into voluntary bankruptcy, ceasing to perform the corporate functions, and surrendering all its property to a trustee to be appointed by the court and creditors, same to be administered and distributed by the court, is one that can be authorized by the board of directors only, and the president . . . can only execute such a petition in the name of the corporation on being authorized so to do by the directors, managers, or trustees." *Id.*; *see also Regal Cleaners & Dyers, Inc. v. Merlis et al.*, 275 F. 915, 916 (2d Cir. 1921) ("There is no presumption of authority in an officer to make and file a voluntary petition in bankruptcy, and he may not do so without the consent of the directors."). One court has held that under New York law, a shareholder agreement can confer power to a certain shareholder to file for bankruptcy protection on behalf of the corporation. *In re Adorn Glass & Venetian Blind Corp.*, Case No. 05 Civ. 1890(RJH), 2005 WL 3481325, at *7 (S.D.N.Y. Dec. 16, 2005).

The various pleadings and documents contained in the record demonstrate the existence of disputed issues of fact with respect to whether Clark and/or the purported board had authority to file the Petition. For example, in response to the Motion, the Debtor alleges that "[t]he board of directors authorized Sergio Clark to file the bankruptcy petition." (Objection ¶ 2.) Moreover, while the Objection provides a tacit admission that Clark was not a member of the board because "the board was not aware that it had to get prior notice and consent . . . with [HPD]"[10] (*Id.* ¶ 4),

---

[10]    The Debtor executed the LDA which, *inter alia*, restricted the power of the Debtor to select board members without approval from HDP. Specifically, LDA § 404(B) states "[t]he [Debtor] hereby agrees that . . . any subsequent additions to the [Debtor's] Board of Directors consisting of individuals who are not corporate officers or directors of Sponsor which occur prior to the expiration of the Restriction Period, shall be subject to HPD approval, which approval shall not be unreasonably withheld." In addition, the Regulatory Agreement (which was incorporated in the Note and Mortgage) executed between NYC, the Debtor and the Sponsor gave HPD the authority to approve any "managing agent" vested with the responsibility of managing and maintaining the Property. (Regulatory Agreement at 7.)

Clark, in theory, may have been duly authorized to file the Petition.  *See In re Jefferson Casket Co.*, 182 F. 689, 691 (N.D.N.Y. 1910).  At the Hearing, Debtor's counsel also stated that HPD was aware that Clark was acting in a managerial capacity based on communications exchanged between Clark and HPD.

The resolution of disputed factual issues would require an evidentiary hearing.  No evidence was presented at the Hearing because Local Rule 9014-2 provides, subject to exceptions not applicable here, that the first scheduled hearing in a contested matter will *not* be an evidentiary hearing.  *See* Local Rule 9014-2.  At this time, in light of the Court's previous findings with respect to cause for stay relief and eventual dismissal, the Court concludes that it is unnecessary to decide whether Clark or the current purported board had authority to file the Petition—the automatic stay is lifted and the case will be dismissed without resolving the issue of authority.

### 2. Bad Faith

The Debtor also disputes NYC's assertion that the Petition was filed in bad faith by stating that "[t]he filing was not a bad faith filing as the debtor as the debtor [sic] maintains that they had it in good faith [sic] had legal rights to maintain and administer assets and property in Chapter 11."  (Objection ¶ 5.)  NYC argues that, based on the Second Circuit's decision in *C-TC 9th Ave. P'Ship v. Norton Co. (In re C-TC 9th Ave. P'Ship)*, 112 F.3d 1304, 1311 (2d Cir. 1997), several indicia of bad faith are present, and consequently, NYC's requested relief is warranted on that ground.

"[T]he standard in [the Second Circuit] is that a bankruptcy petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition

are found." *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997); *see also In re Gen. Growth Props.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009) (following the standard articulated in *Kingston Square Assocs.*); *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 848 (E.D.N.Y. 1995).  A finding of bad faith "requires a full examination of all the circumstances of the case; it is a highly factual determination but also one that may sweep broadly." *C-TC 9th Ave. P'ship*, 113 F.3d at 1312.

Once the movant has established the existence of both subjective bad faith and objective futility, "a rebuttable presumption of bad faith arises and the burden shifts to the debtor 'to establish good and sufficient reasons why the relief should not be granted.'" *Squires Motel, LLC v. Gance (In re Squires Motel, LLC)*, 426 B.R. 29, 34 (N.D.N.Y. 2010) (quoting *In re Yukon Enters., Inc.*, 39 B.R. 919, 921 (Bankr. C.D. Cal. 1984)).  This essentially means that the debtor must demonstrate the existence of "unusual circumstances" that establish that "dismissal is not in the best interests of creditors and the estate."  11 U.S.C. § 1112(b)(1)–(2); *see also Squires Motel*, 39 B.R. at 921.

The Second Circuit in *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311, identified eight factors that were indicative of a bad faith filing:

(1) The debtor has only one asset;

(2) The debtor has few unsecured creditors whose claims are small in relation to those of secured creditors;

(3) The debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) The debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which could be resolved in [a] pending state foreclosure action;

(5) The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) The debtor has little or no cash flow;

(7) The debtor cannot meet current expenses including the payment of personal property and real estate taxes; and

(8) The debtor has no employees.

*Id.* (citing *Pleasant Pointe Apartments, Ltd. v. Ky. Hous. Corp.*, 139 B.R. 828, 832 (W.D. Ky. 1992)); *see also In re Project Orange Assocs.*, 432 B.R. 89, 113 (Bankr. S.D.N.Y. 2010) (applying the *C-TC 9th Ave. P'ship* factors).

The Debtor's filing is possibly indicative of bad faith based on the application of the *C-TC 9th Ave. P'ship* factors. Additionally, based on the reasons previously discussed in the context of the Debtor's unlikelihood of rehabilitation, the Debtor's case is objectively futile. However, since a determination of subjective bad faith is necessarily a fact-intensive inquiry, the Court cannot find that the Petition was filed in bad faith unless and until disputed factual issues are resolved. As with the issue of authority to file the Petition, the Court concludes that it is unnecessary to resolve the bad faith issue as the relief ordered is warranted whether or not the filing was made in bad faith.

### E.  Subsequent Dismissal, As Opposed to Conversion, Is Warranted

It is within the Court's discretion to convert *or* dismiss a chapter 11 case, provided the best interests of the creditors and the estate are served. *In re Acme Cake Co., Inc.*, No. 08-41965 (CEC), 2010 WL 4103761, at *2 (Bankr. E.D.N.Y. Oct. 18, 2010). In this case, dismissal clearly is in the best interests of creditors and the estate because the Property is not freely marketable. With such restrictions on alienation in place, a chapter 7 trustee would have very little (if anything) to distribute to creditors. Conversion would merely increase administrative costs with little attendant benefit to the estate and creditors. The U.S. Trustee appeared at the Hearing and supported dismissal of the case. In light of the disposition of the Motion, there is also no reason to continue mediation of this case.

21

## CONCLUSION

For the reasons discussed above, the Court grants the City's motion to vacate the automatic stay and to withdraw the case from mediation.  A foreclosure sale of the Property will have no adverse effect on the tenants, at least so long as they are paying their rent.  Throughout the foreclosure process, and subsequent conveyance of the Property to a new sponsor, the tenants are allowed to stay in their apartments at the same rent stabilized rates.  As mentioned above, the Court will hold an order dismissing the case in abeyance for ninety days, unless the foreclosure sale has not yet been completed and the City requests an extension of time, or the City notifies the Court that a foreclosure sale has been completed sooner.

A separate order will be entered lifting the automatic stay to permit the City to proceed with a foreclosure sale of the property and withdrawing the case from mediation.  The City should submit a proposed order dismissing the case when a foreclosure sale has been completed.

Dated: New York, New York
       August 25, 2011

                                         _____/s/Martin Glenn_____
                                              MARTIN GLENN
                                         United States Bankruptcy Judge